## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| LUIS CHABLA and JESSICA BARTON, individually on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br><br>v.<br><br>EDGEWELL PERSONAL CARE BRANDS, LLC, EDGEWELL PERSONAL CARE, LLC, and SUN PHARMACEUTICALS, LLC,<br><br>                    Defendants. | Case No.<br><br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br><br><br>Dated:  November 29, 2021 |

Plaintiffs Luis Chabla and Jessica Barton (hereinafter "Plaintiffs"), individually and on behalf of all others similarly situated, by their attorneys, allege the following upon information and belief, except for those allegations pertaining to Plaintiffs, which are based on personal knowledge:

## NATURE OF THE ACTION

1.  This action seeks to remedy the deceptive and misleading business practices of Edgewell Personal Care Brands, LLC; Edgewell Personal Care, LLC; and Sun Pharmaceuticals, LLC (hereinafter collectively "Defendants") with respect to the marketing and sale of Defendants' Banana Boat sunscreen line of products throughout the country, including, but not limited to, the following products (hereinafter collectively the "Products"):

- Banana Boat UltraMist Deep Tanning Dry Oil Continuous Clear Spray SPF 4;

- Banana Boat Kids Max Protect & Play Sunscreen C-Spray SPF 100;

- Banana Boat Ultra Sport Clear Sunscreen Spray SPF 100;

- Banana Boat Kids Sport Sunscreen Lotion Spray SPF 50;

- Banana Boat Protective Dry Oil Clear Sunscreen Spray with Coconut Oil SPF 15;

- Banana Boat Simply Protect Kids Sunscreen Spray SPF 50+; and

- Banana Boat Ultra Defense Ultra Mist Clear Sunscreen Spray SPF 100.

2.      Defendants do specifically list both the active and inactive ingredients of these Products but fail to disclose that the product contains "benzene."

3.      Benzene is a widely recognized and incredibly dangerous substance, especially in the context of applying it to the skin, and it offers no therapeutic sunscreen benefit whatsoever. Rather, it is a harmful carcinogen.

4.      Benzene has been recognized, acknowledged, and accepted as a well-known health hazard and human carcinogen for approximately a century.[1]

5.       For example, Benzene is known to harm the bone marrow and continued exposure can lead to blood cancer, such as leukemia.[2]

6.      Consumers like the Plaintiffs trust manufacturers such as Defendants to sell Products that are safe and free from harmful known toxins and carcinogens, including benzene.

7.      Plaintiffs and those similarly situated (hereinafter "Class Members") certainly expect that the sunscreen they purchase will comply with its labeling and not contain any knowingly harmful substances or carcinogens like benzene.

---

[1]      James Huff, *Benzene-induced cancers; abridge history and occupational health impact*, 13 Int'l J. Occupational and Env't Health 213 (2007), https://pubmed.ncbi.nlm.nih.gov/17718179/.

[2]      *Facts About Benzene,* CENTERS FOR DISEASE CONTROL AND PREVENTION, https://emergency.cdc.gov/agent/benzene/basics/facts.asp (last visited Nov. 23, 2021).

8.      Defendants' specifically manufacture, sell, and distribute the Products in this manner using a marketing and advertising campaign centered around claims that appeal to health-conscious consumers.

9.      For example, Defendants' marketing and advertising campaign includes the one place that every consumer looks when purchasing a product – the packaging and labels themselves. Consumers expect the ingredient listing on the packaging and labels to accurately disclose the ingredients within the Products.

10.     However, Defendants' advertising and marketing campaign is false, deceptive, and misleading because the Products contain benzene, which Defendants do not list or mention anywhere on the Products' packaging or labeling.

11.     Plaintiffs and Class Members relied on Defendants' misrepresentations and omissions of what is in the Products when they purchased them.

12.     Consequently, Plaintiffs and Class Members lost the entire benefit of their bargain when what they received was a sunscreen product contaminated with a known carcinogen.

13.     That is because Defendants' Products containing a known human carcinogen have no value.

14.     As set forth below, sunscreen products, such as Defendants' Products, that contain benzene are in no way safe for humans and are entirely worthless.

15.     Accordingly, Defendants' conduct violated and continues to violate, *inter alia*, New York General Business Law §§349 and 350.  Defendants also breached and continue to breach their warranties regarding the Products.  In addition, Defendants have been and continue to be unjustly enriched.  Lastly, Plaintiffs bring a claim for medical monitoring costs associated with testing, monitoring, and remediating the effects of their benzene exposure.

16.     Plaintiffs bring this action against Defendants on behalf of themselves and Class Members who purchased the Products during the applicable statute of limitations period (the "Class Period").

## FACTUAL BACKGROUND

17.     Sunscreen, also known as sunblock or suntan lotion, is a product Defendants market, advertise, and sell to provide protection against the sun's ultraviolet (UV) rays or radiation.

18.     Sunscreens are categorized according to their mechanism of action. There are physical sunscreens which stay on the surface of the skin and deflect the UV rays or light and chemical sunscreens which absorb the UV light.

19.     Since 1974, sunscreens are assigned a Sun Protection Factor ("SPF") which measures the fraction of harmful UV rays or radiation that reach the skin.  For example, the SPF number tells you how long the sun's UV radiation would take to redden your skin when using the product exactly as directed versus the amount of time without any sunscreen.  So ideally, using a product with SPF 30 would take you 30 times longer to burn than if you weren't wearing sunscreen.  A product with  SPF 30 allows about 3 percent of UVB rays to hit your skin.  A product with SPF of 50 allows about 2 percent of those rays through.  That may seem like a small difference until you realize that the product with SPF 30 is allowing 50 percent more UV radiation onto your skin than the product with SPF 50.

20.     After initial application to the skin, sunscreens must be reapplied often, typically every 2-3 hours, to continue to protect the skin from UV radiation or rays.

21.     The most common active ingredients in sunscreen products sold in the United States include avobenzone, homosalate, octinoxate, octisalate, octocylene, oxybenzone, titanium dioxide, and zinc oxide.

22.     Sunscreen's products include lotions, sprays, and gels.

23.     Sales of sun care products including sustain lotions, sprays, and gels have steadily increased as consumers have become more vigilant and health conscious in terms of protecting their skin from the exposure to UV rays or radiation which can cause sunburn and increases the risk for skin cancer.  As of 2016, the estimated market size of the sun care market was $1.95 billion.[3]

24.     Consumers have become increasingly concerned about the effects of synthetic and chemical ingredients in products that they and their family members put on and/or into their bodies. Companies such as Defendants have capitalized on consumers' desire for healthy and safe products, and indeed, consumers are willing to pay, and have paid, a premium for these products.

25.     Consumers lack the meaningful ability to test or independently ascertain or verify whether a product contains unsafe substances, such as benzene, especially at the point of sale, and therefore must and do rely on Defendants to truthfully and honestly report what the Products contain on the Products' packaging or labels.

26.     The Products' packaging does not identify benzene.  Indeed, benzene is not listed in the ingredients section, nor is there any warning about the inclusion (or even potential inclusion) of benzene in the Products.  This leads reasonable consumers to believe the Products do not contain dangerous chemicals like benzene.

27.     However, despite the fact that the Products' labeling and ingredient listing do not list benzene, the Products contain benzene.

---

[3]     *U.S. Sun Care Market Size, Share & Trends Analysis Report, By Product (Self-tanning, After sun, Sun protection), Competitive Landscape, And Segment Forecasts, 2018 – 2025*, GRAND VIEW RESEARCH (Apr. 2018), https://www.grandviewresearch.com/industry-analysis/us-sun-care-market.

28.     Twenty-first century research has confirmed that there is no safe level of benzene exposure.[4]

29.     Benzene has been recognized, acknowledged, and accepted as a well-known health hazard and human carcinogen for approximately a century.[5]

30.     The National Toxicology Program (hereinafter "NTP") has regarded benzene as "known to be a human carcinogen based on sufficient evidence of carcinogenicity from studies in humans."[6]

31.     The World Health Organization ("WHO") and the International Agency for research on Cancer ("IARC") have classified benzene as a Group 1 compound thereby defining it as "carcinogenic to humans."[7]

32.     The National Institute for Occupational Safety and Health ("NIOSH") recommends protective equipment be worn by workers exposed or expecting to be exposed to benzene at concentrations of 0.1 ppm and defines "inhalation, skin absorption, ingestion, skin and/or eye contact" as exposure routes or paths.[8]

33.     Direct benzene exposure through the skin is particularly concerning.  For example, "[d]irect exposure of the eyes, skin, or lungs to benzene can cause tissue injury and irritation."[9]

---

[4]     *Advances in Understanding Benzene Health Effects and Susceptibility*, 31 ANNUAL REVIEW OF PUBLIC HEALTH 133 (Apr. 21, 2010), https://www.annualreviews.org/doi/full/10.1146/annurev.publhealth.012809.103646.

[5]     *Supra* note 1.

[6]     *Benzene,* Report on Carcinogens, Fourteenth Edition, DEPT. OF HEALTH AND HUMAN SERVICES (Nov. 3, 2016), https://ntp.niehs.nih.gov/ntp/roc/content/profiles/benzene.pdf.

[7]     *Benzene*, IARC MONOGRAPHS ON THE EVALUATION OF CARCINOGENIC RISKS TO HUMANS, Volume 120 (2018), https://publications.iarc.fr/_publications/media/download/6043/20a78ade14e86cf076c3981a9a094f45da6d27cc.pdf.

[8]     *NIOSH Pocket Guide to Chemical Hazards - Benzene*, THE NATIONAL INSTITUTE FOR OCCUPATIONAL SAFETY AND HEALTH (NIOSH), https://www.cdc.gov/niosh/npg/npgd0049.html (last visited Nov. 23, 2021).

[9]     *Supra* note 2.

34.     Research also has revealed that sunscreen ingredients can be absorbed through the skin into the bloodstream.[10]

35.     Moreover, a study by Health Canada's Bureau of Chemical Hazards concluded that "the application of sunscreen specifically increases the absorption rate of benzene through the skin," thereby increasing the risk of harm.[11]

36.     Even low levels of benzene are particularly dangerous in a sunscreen product because "[s]unscreen products are typically used in many times higher volume than standard drug products like tablets or capsules, so even a relatively low concentration limit can result in very high total [benzene] exposure."[12]

37.     Experts in the field of dermatology agree with this assessment.  For example, Christopher Bunick, a professor of dermatology at Yale University has stated:

> Considering that human skin has a large total surface area (~1.85 m2), and that ~28.5 g of sunscreen is needed per application to properly cover that skin surface, it follows then that there is not a safe level of benzene that can exist in sunscreen products. The total mass of sunscreen required to cover and protect the human body, in single daily application or repeated applications daily, means that even benzene at 0.1 ppm in a sunscreen could expose people to excessively high nanogram amounts of benzene.[13]

38.     FDA guidance provides that no level of benzene is safe, and benzene is not permitted in these types of sunscreen products.  The FDA currently recognizes the high danger of this compound and lists it as a "Class 1 solvent" that "should not be employed in the manufacture

---

[10]     Dr. Manavjeet Sidhu, *Sunscreen can be absorbed in the bloodstream, new study says*, ABCNews (Jan. 20, 2020, 8:30 AM), https://abcnews.go.com/Health/sunscreen-absorbed-bloodstream-testing-needed/story?id=68442221 (last visited Nov. 23, 2021).

[11]     *Valisure Detects Benzene in Sunscreen*, VALISURE BLOG (May 25, 2021), https://www.valisure.com/blog/valisure-news/valisure-detects-benzene-in-sunscreen/.

[12]     Letter from Valisure, LLC to the Food and Drug Administration, re: Valisure Citizen Petition on Benzene in Sunscreen and After-sun Care Products (May 24, 2021) (https://www.valisure.com/wp-content/uploads/Valisure-Citizen-Petition-on-Benzene-in-Sunscreen-and-After-sun-Care-Products-v9.7.pdf/) at 16.

[13]     *Id.* at 17.

of drug substances, excipients, and drug products because of their unacceptable toxicity . . . . However, if their use is unavoidable in order to produce a drug product with a significant therapeutic advance, then their levels should be restricted" and benzene is restricted under such guidance to 2 parts per million("ppm").[14]

39.    Additionally, and not surprising, in the FDA's "list of acceptable active ingredients in products that are labeled as sunscreen," benzene is not listed among them.[15]

40.    This is why recent research revealing benzene in Defendants' Products is particularly concerning.

41.    Valisure, LLC (an analytical pharmacy, patient advocacy, and consumer protection organization) ("Valisure") recently published a study ("Study") that found benzene in 43 out of 234 sunscreens and in 8 out of 48 after-sun products.[16]

42.    In addition to Plaintiffs' own research of existing and available information, Valisure also found that Defendants' Products contained benzene through its own laboratory testing.[17] Valisure's testing done on the Banana Boat Product revealed widespread benzene contamination.  Although the entire product line was not tested, benzene contamination was revealed through testing of the following products: Kids Max Protect & Play Sunscreen Spray, Kids Sport sunscreen, Protective Dry Oil Clear Sunscreen Spray, Simply Protect Kids (a/k/a Kids

---

[14]    *Supra* note 11.

[15]    *Sunscreen: How to Help Protect Your Skin from the Sun,* FOOD AND DRUG ADMIN., https://www.fda.gov/drugs/understanding-over-counter-medicines/sunscreen-how-help-protect-your-skin-sun   (last visited Nov. 23, 2021).

[16]    *Supra* note 11.

[17]    *Supra* note 12.

Mineral Enriched) Sunscreen Spray, Ultra Defense Ultra Mist Clear Sunscreen Spray, Ultra Sport Clear Sunscreen Spray, and UltraMist Deep tanning Oil Continuous Clear Spray.[18]

43.     Because the majority of the products tested did not contain detectable levels of benzene, its use is not "unavoidable" in order to achieve the therapeutic benefits of sunscreen.

44.     In fact, Defendants could avoid exposing Plaintiffs and the Class to benzene in the manufacturing process and the Products could have been sold with absolutely no benzene in them.[19]

45.     Valisure investigated the possibility that benzene occurred due to the natural degradation of sunscreen's active ingredients and determined that it did not.  Thus, the presence of benzene in the sunscreen products is likely due to contamination during the manufacturing process.[20]

46.     Benzene was not listed as an active ingredient on the Product label nor did the Product Label inform and/or warn the consumer of the benzene contamination or risk of benzene contamination.

47.     Therefore, Defendants' false, misleading, and deceptive misrepresentations and omissions regarding the ingredients of the Products are likely to continue to deceive and mislead reasonable consumers and the public, as they have already deceived and misled Plaintiffs and the Class Members.

48.     Defendants' concealment was material and intentional because people are concerned with what is in the products that they are putting onto and into their bodies.  Consumers such as Plaintiffs and the Class Members are influenced by the ingredients listed.  Defendants

---

[18]     *Id*. at 13-15.

[19]     *Id*. at 2.

[20]     *Id*. at 7-8.

know that if it had not omitted that the Products contained benzene, then Plaintiffs and the Class would not have purchased the Products at all.

## JURISDICTION AND VENUE

49.     This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. section §1332(d) in that (1) this is a class action involving more than 100 class members; (2) Plaintiff Chabra is a citizen of New York, Plaintiff Barton is a citizen of New York, Defendant Edgewell Personal Care Brands, LLC is a citizen of Connecticut, Defendant Edgewell Personal Care, LLC is a citizen of Connecticut, and Defendant Sun Pharmaceuticals, LLC is a citizen of Connecticut; and (3) the amount in controversy is in excess of $5,000,000, exclusive of interests and costs.

50.     This Court has personal jurisdiction over Defendants because Defendants conduct and transact business in the state of Connecticut, contract to supply goods within the state of Connecticut, and supply goods within the state of Connecticut.

51.     Venue is proper because Defendants are headquartered and reside in the state of Connecticut.  A substantial part of the events or omissions giving rise to the Classes' claims occurred in this district.

## PARTIES

**Plaintiffs**

52.     Plaintiff Luis Chabla is a citizen and resident of the state of New York.  During the applicable statute of limitations period, Plaintiff purchased Defendants' Products that contained benzene, including, but not limited to, the Banana Boat Protective Dry Oil Clear Sunscreen Spray with Coconut Oil SPF 15.

53.     Plaintiff Jessica Barton is a citizen and resident of the state of New York.  During the applicable statute of limitations period, Plaintiff purchased Defendants' Products that contained benzene, including, but not limited to, the Banana Boat UltraMist Deep Tanning Dry Oil Continuous Clear Spray SPF 4 and Banana Boat Ultra Sport Clear Sunscreen Spray SPF 100.

54.     Had Defendants not made the false, misleading, and deceptive representations and omissions regarding the Products containing benzene, Plaintiffs would not have been willing to purchase the Products.  Plaintiffs purchased, purchased more of, and/or paid more for, the Products than they would have had they known the truth about the Products.  The Products Plaintiffs received were worthless because they contain the known carcinogen benzene.  Accordingly, Plaintiffs were injured in fact and lost money as a result of Defendants' improper conduct.

**Defendants**

55.     Defendant Edgewell Personal Care Brands, LLC is a Delaware Limited Liability Corporation with its headquarters in Shelton, Connecticut.  Edgewell Personal Care Brands, LLC conducts business throughout the United States, including this district.  Edgewell Personal Care Brands, LLC is a wholly owned subsidiary of and/or 100% controlled by Edgewell Personal Care Company, which is also responsible for the manufacturing, marketing, advertising, and distributing of the Products.

56.     Defendant Edgewell Personal Care, LLC is a Delaware Limited Liability Corporation with its headquarters in Shelton, Connecticut.  Edgewell Personal Care, LLC conducts business throughout the United States, including this district.  Edgewell Personal Care, LLC is a wholly owned subsidiary of and/or 100% controlled by Edgewell Personal Care Company, which is also responsible for the manufacturing, marketing, advertising, and distributing of the Products.

57.     Defendant Sun Pharmaceuticals, LLC is a Delaware limited liability company with its headquarters and principal place of business located in Shelton, Connecticut.   Sun Pharmaceuticals, LLC conducts business throughout the United States, including this district.   Sun Pharmaceuticals, LLC is a subsidiary of Edgewell Personal Care Company and is also responsible for the manufacturing, marketing, advertising, and distributing of the Banana Boat sunscreen products.

58.     Defendants' manufacture, market, advertise, and distribute the Products throughout the United States.   Defendants created and/or authorized the false, misleading, and deceptive advertisements, packaging, and labeling of their Products.

## CLASS ALLEGATIONS

59.     Plaintiffs bring this matter on behalf of themselves and those similarly situated.   As detailed at length in this Complaint, Defendants orchestrated deceptive marketing and labeling practices.   Defendants' customers were uniformly impacted by and exposed to this misconduct. Accordingly, this Complaint is uniquely situated for class-wide resolution, including injunctive relief.

60.     The Class is defined as all consumers who purchased the Products anywhere in the United States during the Class Period.

61.     Plaintiffs also seek certification, to the extent necessary or appropriate, of a subclass of individuals who purchased the Products in the state of New York at any time during the Class Period (the "New York Subclass").

62.     The Class and New York Subclass shall be referred to collectively throughout the Complaint as the Class.

63.     The Class is properly brought and should be maintained as a class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy because:

64.     <u>Numerosity</u>: Class Members are so numerous that joinder of all members is impracticable.  Plaintiffs believe that there are thousands of consumers in the Class and the New York Class who are Class Members as described above who have been damaged by Defendants' deceptive and misleading practices.

65.     <u>Commonality</u>: The questions of law and fact common to the Class Members which predominate over any questions which may affect individual Class Members include, but are not limited to:

a.      whether Defendants are responsible for the conduct alleged herein, which was uniformly directed at all consumers who purchased the Products;

b.      whether Defendants' misconduct set forth in this Complaint demonstrates that Defendants have engaged in unfair, fraudulent, or unlawful business practices with respect to the advertising, marketing, and sale of their Products;

c.      whether Defendants made false and/or misleading statements and omissions to the Class and the public concerning the contents of their Products;

d.      whether Defendants' false and misleading statements and omissions concerning their Products were likely to deceive the public; and

e.      whether Plaintiffs and the Class are entitled to money damages under the same causes of action as the other Class Members.

66.     <u>Typicality</u>: Plaintiffs are members of the Class.  Plaintiffs' claims are typical of the claims of each Class Member in that every member of the Class was susceptible to the same

deceptive and misleading conduct and purchased Defendants' Products. Plaintiffs are entitled to relief under the same causes of action as the other Class Members.

67.     Adequacy: Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the Class Members they seek to represent, their consumer fraud claims are common to all members of the Class, they have a strong interest in vindicating their rights, they have retained counsel competent and experienced in complex class action litigation, and counsel intends to vigorously prosecute this action.

68.     Predominance: Pursuant to Rule 23(b)(3), common issues of law and fact identified above predominate over any other questions affecting only individual members of the Class. The Class issues fully predominate over any individual issues because no inquiry into individual conduct is necessary; all that is required is a narrow focus on Defendants' deceptive and misleading marketing and labeling practices.

69.     Superiority: A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because:

a.     the joinder of thousands of individual Class Members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation resources;

b.     the individual claims of the Class Members may be relatively modest compared with the expense of litigating the claims, thereby making it impracticable, unduly burdensome, and expensive – if not totally impossible – to justify individual actions;

c.     when Defendants' liability has been adjudicated, all Class Members' claims can be determined by the Court and administered efficiently in a manner far less burdensome and expensive than if it were attempted through filing, discovery, and trial of all individual cases;

d.      this class action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of Class claims;

e.      Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action;

f.      this class action will assure uniformity of decisions among Class Members;

g.      the Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation;

h.      Class Members' interests in individually controlling the prosecution of separate actions is outweighed by their interest in efficient resolution by single class action; and

i.      it would be desirable to concentrate in this single venue the litigation of all Class Members who were induced by Defendants' uniform false advertising to purchase their Products.

69.      Accordingly, this Class is properly brought and should be maintained as a class action under Rule 23(b)(3) because questions of law or fact common to Class Members predominate over any questions affecting only individual members, and because a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

## INJUNCTIVE CLASS RELIEF

70.      Rules 23(b)(1) and (2) contemplate a class action for purposes of seeking class-wide injunctive relief.  Here, Defendants have engaged in conduct resulting in misleading consumers about ingredients in the Products.  Since Defendants' conduct has been uniformly directed at all consumers in the United States, and the conduct continues presently, injunctive relief

on a class-wide basis is a viable and suitable solution to remedy Defendants' continuing misconduct. Plaintiffs would purchase the Products again if they did not include benzene.

71.     The injunctive Class is properly brought and should be maintained as a class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy because:

    a.     <u>Numerosity</u>: Individual joinder of the injunctive Class Members would be wholly impracticable. Defendants' Products have been purchased by thousands of people throughout the United States.

    b.     <u>Commonality</u>: Questions of law and fact are common to members of the Class. Defendants' misconduct was uniformly directed at all consumers. Thus, all members of the Class have a common cause against Defendants to stop their misleading conduct through an injunction. Since the issues presented by this injunctive Class deal exclusively with Defendants' misconduct, resolution of these questions would necessarily be common to the entire Class. Moreover, there are common questions of law and fact inherent in the resolution of the proposed injunctive class, including, *inter alia*:

        i.     resolution of the issues presented in the 23(b)(3) class;

        ii.     Wwether members of the Class will continue to suffer harm by virtue of Defendants' deceptive product marketing and labeling; and

        iii.     whether, on equitable grounds, Defendants should be prevented from continuing to deceptively mislabel the Products.

    c.     <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the injunctive Class because their claims arise from the same course of conduct (*i.e.*, Defendants' deceptive and misleading marketing, labeling, and advertising practices). Plaintiffs are typical

representatives of the Class because, like all members of the injunctive Class, they purchased Defendants' Products, which were sold unfairly and deceptively to consumers throughout the United States.

      d.    <u>Adequacy</u>: Plaintiffs will fairly and adequately represent and protect the interests of the injunctive Class.  Their consumer protection claims are common to all members of the injunctive Class and they have a strong interest in vindicating their rights.  In addition, Plaintiffs and the Class are represented by counsel who are competent and experienced in both consumer protection and class action litigation.

72.    Plaintiffs seek injunctive relief on behalf of the Class Members on grounds generally applicable to the entire injunctive Class, and Defendants have acted or refused to act in a manner that applies generally to the injunctive Class (*i.e.*, Defendants have marketed their Products using the same misleading and deceptive labeling to all of the Class Members).

73.    Plaintiffs also seek to include an injunction to require the implementation and funding of a blood serum testing program for the Plaintiffs and Class Members to test for the presence of benzene in their blood serum; and the implementation and funding of a medical monitoring program for Plaintiffs and Class Members sufficient to monitor Plaintiffs' and Class Members' health to ensure they are adequately monitored for the harmful effects of benzene in the human body.

74.    Any final injunctive relief or declaratory relief would benefit the entire injunctive Class as Defendants would be prevented from continuing their misleading and deceptive marketing practices and would be required to honestly disclose to consumers the true nature of the contents of the Products.

## CLAIMS

### FIRST CAUSE OF ACTION
### VIOLATION OF NEW YORK GBL §349
**(On Behalf of Plaintiffs and New York Subclass Members)**

75.     Plaintiffs repeat and reallege each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

76.     New York General Business Law Section 349 ("GBL §349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state . . . ."

77.     The conduct of Defendants alleged herein constitutes recurring, "unlawful" deceptive acts and practices in violation of GBL §349, and as such, Plaintiffs and the New York Subclass Members seek monetary damages against Defendants, enjoining them from inaccurately describing, labeling, marketing, and promoting the Products.

78.     There is no adequate remedy at law.

79.     Defendants misleadingly, inaccurately, and deceptively advertise and market their Products to consumers.

80.     Defendants' improper consumer-oriented conduct – including failing to disclose that the Products have benzene – is misleading in a material way in that it, *inter alia*, induced Plaintiffs and the New York Subclass Members to purchase Defendants' Products and to use the Products when they otherwise would not have.  Defendants made the untrue and/or misleading statements and omissions willfully, wantonly, and with reckless disregard for the truth.

81.     Plaintiffs and the New York Subclass Members have been injured inasmuch as they purchased products that were mislabeled, unhealthy, and entirely worthless.   Accordingly,

Plaintiffs and the New York Subclass Members received less than what they bargained and paid for.

82.     Defendants' advertising and the Products' packaging and labeling induced Plaintiffs and the New York Subclass Members to buy Defendants' Products.

83.     Defendants' deceptive and misleading practices constitute a deceptive act and practice in the conduct of business in violation of New York General Business Law §349(a) and Plaintiffs and the New York Subclass Members have been damaged thereby.

84.     As a result of Defendants' recurring, "unlawful" deceptive acts and practices, Plaintiffs and the New York Subclass Members are entitled to monetary, statutory, compensatory, treble and punitive damages, restitution, and disgorgement of all moneys obtained by means of Defendants' unlawful conduct, interest, and attorneys' fees and costs.

**SECOND CAUSE OF ACTION**
**VIOLATION OF NEW YORK GBL §350**
**(On Behalf of Plaintiffs and the New York Subclass Members)**

85.     Plaintiffs repeat and reallege each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

86.     N.Y. Gen. Bus. Law §350 provides, in part, as follows:

False advertising in the conduct of any business, trade, or commerce or in the furnishing of any service in this state is hereby declared unlawful.

87.     N.Y. Gen. Bus. Law §350a(1) provides, in part, as follows:

The term "false advertising" means advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect.  In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions

proscribed in said advertisement, or under such conditions as are customary or usual.

88.     Defendants' labeling and advertisements contain untrue and materially misleading statements and omissions concerning its Products inasmuch as they misrepresent that the Products are safe for use and don't list that the Products contain benzene.

89.     Plaintiffs and the New York Subclass Members have been injured inasmuch as they relied upon the labeling, packaging, and advertising and purchased Products that were mislabeled, unhealthy, and entirely worthless.  Accordingly, Plaintiffs and the New York Subclass Members received less than what they bargained and paid for.

90.     Defendants' advertising, packaging, and the Products' labeling induced Plaintiffs and the New York Subclass Members to buy Defendants' Products.

91.     Defendants made their untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

92.     Defendants' conduct constitutes multiple, separate violations of N.Y. Gen. Bus. Law §350.

93.     Defendants made the material misrepresentations described in this Complaint in its advertising and on the Products' packaging and labeling.

94.     Defendants' material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large.  Moreover, all consumers purchasing the Products were and continue to be exposed to Defendants' material misrepresentations.

95.     As a result of Defendants' recurring, "unlawful" deceptive acts and practices, Plaintiffs and New York Subclass Members are entitled to monetary, statutory, compensatory, treble and punitive damages, restitution, and disgorgement of all moneys obtained by means of Defendants' unlawful conduct, interest, and attorneys' fees and costs.

## THIRD CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY
### (On Behalf of Plaintiffs and All Class Members)

96.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

97.     Defendants provided Plaintiffs and Class Members with an express warranty in the form of written affirmations of fact promising and representing that the Products are safe for use and do not contain benzene.

98.     The above affirmations of fact were not couched as "belief" or "opinion" and were not "generalized statements of quality not capable of proof or disproof."

99.     These affirmations of fact became part of the basis for the bargain and were material to Plaintiffs and Class Members' transactions.

100.    Plaintiffs and Class Members reasonably relied upon Defendants' affirmations of fact and justifiably acted in ignorance of the material facts omitted or concealed when they decided to buy Defendants' Products.

101.    Defendants knowingly breached the express warranties by including benzene in the Products sold to Plaintiffs and the Class without properly notifying them of their inclusion in the Products.

102.    Within a reasonable time after it knew or should have known, Defendants did not change the Products' labels to include benzene in the ingredient list.

103.    Defendants thereby breached the following state warranty laws:

a.      Code of Ala. § 7-2-313;

b.      Alaska Stat. § 45.02.313;

c.      A.R.S. § 47-2313;

d.      A.C.A. § 4-2-313;

e.      Cal. Comm. Code § 2313;

f.      Colo. Rev. Stat. § 4-2-313;

g.      Conn. Gen. Stat. § 42a-2-313;

h.      6 Del. C. § 2-313;

i.      D.C. Code § 28:2-313;

j.      Fla. Stat. § 672.313;

k.      O.C.G.A. § 11-2-313;

l.      H.R.S. § 490:2-313;

m.      Idaho Code § 28-2-313;

n.      810 I.L.C.S. 5/2-313;

o.      Ind. Code § 26-1-2-313;

p.      Iowa Code § 554.2313;

q.      K.S.A. § 84-2-313;

r.      K.R.S. § 355.2-313;

s.      11 M.R.S. § 2-313;

t.      Md. Commercial Law Code Ann. § 2-313;

u.      106 Mass. Gen. Laws Ann. § 2-313;

v.      M.C.L.S. § 440.2313;

w.      Minn. Stat. § 336.2-313;

x.      Miss. Code Ann. § 75-2-313;

y.      R.S. Mo. § 400.2-313;

z.      Mont. Code Anno. § 30-2-313;

aa.     Neb. Rev. Stat. § 2-313;

bb.     Nev. Rev. Stat. Ann. § 104.2313;

cc.     R.S.A. 382-A:2-313;

dd.     N.J. Stat. Ann. § 12A:2-313;

ee.     N.M. Stat. Ann. § 55-2-313;

ff.     N.Y. U.C.C. Law § 2-313;

gg.     N.C. Gen. Stat. § 25-2-313;

hh.     N.D. Cent. Code § 41-02-30;

ii.     II. O.R.C. Ann. § 1302.26;

jj.     12A Okl. St. § 2-313;

kk.     Or. Rev. Stat. § 72-3130;

ll.     13 Pa. Rev. Stat. § 72-3130;

mm.     R.I. Gen. Laws § 6A-2-313;

nn.     S.C. Code Ann. § 36-2-313;

oo.     S.D. Codified Laws, § 57A-2-313;

pp.     Tenn. Code Ann. § 47-2-313;

qq.     Tex. Bus. & Com. Code § 2.313;

rr.     Utah Code Ann. § 70A-2-313;

ss.     9A V.S.A. § 2-313;

tt.     Va. Code Ann. § 59.1-504.2;

uu.     Wash. Rev. Code Ann. § 6A.2-313;

vv.     W. Va. Code § 46-2-313;

ww.     Wis. Stat. § 402.313; and

xx.      Wyo. Stat. § 34.1-2-313.

104.    As a direct and proximate result of Defendants' breach of the express warranties, Plaintiffs and Class Members were damaged in the amount of the price they paid for the Products, in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (On Behalf of Plaintiffs and All Class Members)

105.    Plaintiffs bring this count on behalf of themselves and the Class and repeat and re-allege all previous paragraphs, as if fully included herein.

106.    Defendants sold and Plaintiffs and Class Members purchased the Products.

107.    When sold by Defendants, the Products were not merchantable, did not pass without objection in the trade under the label description, were not of adequate quality within that description, were not fit for the ordinary purposes for which such goods are used, and did not conform to the promises or affirmations of fact made on their container or label.

108.    Because the Products contain benzene, they in no way were safe for use as sunscreen products.

109.    As a direct result of Defendants' products being unfit for its intended purpose and/or otherwise not merchantable, Plaintiffs and Class members were damaged because they would not have purchased Defendants' Products had they known the true facts regarding the benzene content.

## FIFTH CAUSE OF ACTION
## FRAUDULENT CONCEALMENT
### (On Behalf of Plaintiffs and All Class Members)

110.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

111.    Defendants concealed and failed to disclose on the Products' packaging and labeling the material fact that the Products contained benzene, and that the Products were not safe or healthy for use.

112.    Defendants had knowledge that the Products contained benzene, and that the Products were not safe or healthy for use.

113.    Defendants have a duty to disclose that the Products contained benzene, and that the Products were not safe or healthy for use.

114.    Defendants had superior knowledge or means of knowledge available to them and knew that Plaintiffs and Class Members would rely upon the representations and omissions of Defendants regarding the quality and ingredients of their Products.  Consumers lack the meaningful ability to test or independently ascertain or verify whether a product contains benzene, especially at the point of sale.

115.    Defendants' concealment was material and intentional because people are concerned with what is in the products that they are putting onto and into their bodies.  Consumers such as Plaintiffs and the Class Members are influenced by the ingredients listed, as well as any warnings (or lack thereof) on the products they buy.  Defendants know that if they had not omitted that the Products contained benzene, then Plaintiffs and the Class would not have purchased the Products at all; however, Defendants wanted to increase sales and profits.

116.    Defendants' concealment misled Plaintiffs and the Class as to the true nature of what they were buying and putting onto and into their bodies.

117.    Defendants fraudulently concealed that the Products contained benzene and that the Products were not safe or healthy for use.  Consequently, Plaintiffs and the other members of the Class have suffered injury and are entitled to damages in an amount to be proven at trial.

**SIXTH CAUSE OF ACTION**
**MEDICAL MONITORING**
**(On Behalf of Plaintiffs and All Class Members)**

118.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

119.    As a result of Defendants' negligence, Plaintiffs and Class Members have been subjected to exposure to the carcinogen benzene.

120.    As a proximate result of Plaintiffs' and Class Members' exposure to benzene, Plaintiffs and Class Members have a significantly increased risk of serious medical complications, including ailments such as bone marrow harm and blood cancer (such as leukemia).

121.    A monitoring procedure exists that makes the early detection of these types of ailments possible.

122.    The prescribed monitoring program is reasonably necessary according to contemporary scientific principles.

123.    Defendants' acts were willful, wanton, or reckless and conducted with a reckless indifference to the health and rights of Plaintiffs and Class Members.

## SEVENTH CAUSE OF ACTION
## UNJUST ENRICHMENT
### (On Behalf of Plaintiffs and All Class Members in the Alternative)

124.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

125.    Plaintiffs, on behalf of themselves and consumers nationwide, bring a claim for unjust enrichment.

126.    Defendants' conduct violated, *inter alia*, state and federal law by manufacturing, advertising, marketing, and selling the Products while misrepresenting and omitting material facts.

127.    Defendants' unlawful conduct, as described in this Complaint, allowed Defendants to knowingly realize substantial revenues from selling the Products at the expense of, and to the detriment or impoverishment of, Plaintiffs and Class Members and to Defendants' benefit and enrichment.  Defendants have thereby violated fundamental principles of justice, equity, and good conscience.

128.    Plaintiffs and Class Members conferred significant financial benefits and paid substantial compensation to Defendants for the Products, which were not as Defendants represented them to be.

129.    It is inequitable for Defendants to retain the benefits conferred by Plaintiffs and Class Members' overpayments.

130.    Plaintiffs and Class Members seek establishment of a constructive trust from which Plaintiffs and Class Members may seek restitution.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for judgment as follows:

A.    Declaring this action to be a proper class action and certifying Plaintiffs as the

representatives of the Class under Rule 23 of the Federal Rules of Civil Procedure;

B.      Entering preliminary and permanent injunctive relief against Defendants, directing Defendants to correct their practices and to comply with consumer protection statutes nationwide, including New York consumer protection laws;

C.      An Order requiring Defendants to establish a blood testing program for Plaintiffs and the Class, as well as to establish a medical monitoring protocol for Plaintiffs and the Class to monitor individuals' health and diagnose at an early stage any ailments associated with exposure to benzene;

D.      Awarding monetary damages and treble damages;

E.      Awarding statutory damages of $50 per transaction, and treble damages for knowing and willful violations, pursuant to N.Y. GBL §349;

F.      Awarding statutory damages of $500 per transaction pursuant to N.Y. GBL §350;

G.      Awarding punitive damages;

H.      Awarding Plaintiffs and Class Members their costs and expenses incurred in this action, including reasonable allowance of fees for Plaintiffs' attorneys, experts, and reimbursement of Plaintiffs' expenses; and

I.      Granting such other and further relief as the Court may deem just and proper.

## <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury on all issues.

Dated: November 29, 2021                  **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

/s/ Joseph P. Guglielmo
Joseph P. Guglielmo (ct27481)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Tel:  212-223-6444

Fax: 212-223-6334
jguglielmo@scott-scott.com


Jason P. Sultzer, Esq.
Joseph Lipari, Esq.
Daniel Markowitz, Esq.
**THE SULTZER LAW GROUP P.C.**
270 Madison Avenue, Suite 1800
New York, NY 10016
Tel: (845) 483-7100
Fax: (888) 749-7747
sultzerj@thesultzerlawgroup.com
liparij@thesultzerlawgroup.com
markowitzd@thesultzerlawgroup.com

David C. Magagna Jr., Esq.
Charles E. Schaffer, Esq.
LEVIN SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: 215-592-1500
dmagagna@lfsblaw.com
cschaffer@lfsblaw.com

*Counsel for Plaintiffs and the Class*