## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| LUIS CHABLA and JESSICA BARTON, individually on behalf of themselves and all others similarly situated, | Case No. 3:21-cv-01579-JAM |
| Plaintiffs, | |
| v. | **AMENDED CLASS ACTION COMPLAINT** |
| EDGEWELL PERSONAL CARE BRANDS, LLC, EDGEWELL PERSONAL CARE, LLC, and SUN PHARMACEUTICALS, LLC, | <u>**JURY TRIAL DEMANDED**</u> |
| Defendants. | |
| | Dated:  March 14, 2022 |

Plaintiffs Luis Chabla and Jessica Barton (hereinafter "Plaintiffs"), individually and on behalf of all others similarly situated, by their attorneys, allege the following upon information and belief, except for those allegations pertaining to Plaintiffs, which are based on personal knowledge:

## <u>NATURE OF THE ACTION</u>

1.     This action seeks to remedy the deceptive and misleading business practices of Edgewell Personal Care Brands, LLC; Edgewell Personal Care, LLC; and Sun Pharmaceuticals, LLC (hereinafter collectively "Defendants") with respect to the marketing and sale of Defendants' Banana Boat sunscreen line of products throughout the country, including, but not limited to, the following products (hereinafter collectively the "Products"):

- Banana Boat UltraMist Deep Tanning Dry Oil Continuous Clear Spray SPF 4;

- Banana Boat Kids Max Protect & Play Sunscreen C-Spray SPF 100;

- Banana Boat Ultra Sport Clear Sunscreen Spray SPF 100;

- Banana Boat Kids Sport Sunscreen Lotion Spray SPF 50;

- Banana Boat Protective Dry Oil Clear Sunscreen Spray with Coconut Oil SPF 15;

- Banana Boat Simply Protect Kids Sunscreen Spray SPF 50+; and

- Banana Boat Ultra Defense Ultra Mist Clear Sunscreen Spray SPF 100.

2.    Defendants do specifically list both the active and inactive ingredients of these Products but fail to disclose that the product contains "benzene."

3.    For example, a representative example of Defendant's lack of disclosure can be seen below[1]:

---

[1] https://www.walgreens.com/store/c/banana-boat-sport-ultra-clear-sunscreen-spray-spf-100/ID=prod6057753-product?ext=gooBeauty+
+SSC+TestAd+group___local&gclsrc=aw.ds&&gclid=CjwKCAiAg6yRBhBNEiwAeVyL0Exw
wMGonUZG9rCeQM-hiU_XDOnG2mJsMFtHPs2ncWTHRFeZ_FwSDBoCpkAQAvD_BwE



## Active Ingredients

Avobenzone 3.0%, Homosalate 10.0%, Octisalate 5.0%, Octocrylene 10.0%, Oxybenzone 6.0%

**Inactive ingredients:** Alcohol Denat., Isobutane, VA/Butyl Maleate/Isobornyl Acrylate Copolymer, Caprylyl Glycol, Cyclopentasiloxane, Cyclohexasiloxane, Fragrance, Polyglyceryl-3 Stearate/Isostearate/Dimer Dilinoleate Crosspolymer, Lauryl PEG-8 Dimethicone, Phenylisopropyl Dimethicone, Ascorbyl Palmitate, Methyl Dihydroabietate, Tocopheryl Acetate, Mineral Oil, Panthenol, Water, Aloe Barbadensis Leaf Extract.

4.      Benzene is a widely recognized and incredibly dangerous substance, especially in the context of applying it to the skin, and it offers no therapeutic sunscreen benefit whatsoever. Rather, it is a harmful carcinogen.

5.      Benzene has been recognized, acknowledged, and accepted as a well-known health hazard and human carcinogen for approximately a century.[2]

6.       For example, Benzene is known to harm the bone marrow and continued exposure can lead to blood cancer, such as leukemia.[3]

7.      Consumers like the Plaintiffs trust manufacturers such as Defendants to sell Products that are safe and free from harmful known toxins and carcinogens, including benzene.

8.      Plaintiffs and those similarly situated (hereinafter "Class Members") certainly expect that the sunscreen they purchase will comply with its labeling and not contain any knowingly harmful substances or carcinogens like benzene.

9.      Defendants' specifically manufacture, sell, and distribute the Products in this manner using a marketing and advertising campaign centered around claims that appeal to health-conscious consumers.

10.      For example, Defendants' marketing and advertising campaign includes the one place that every consumer looks when purchasing a product – the packaging and labels themselves. Consumers expect the ingredient listing on the packaging and labels to accurately disclose the ingredients within the Products.

---

[2]      James Huff, *Benzene-induced cancers; abridge history and occupational health impact*, 13 Int'l J. Occupational and Env't Health 213 (2007), https://pubmed.ncbi.nlm.nih.gov/17718179/.

[3]      *Facts About Benzene,* CENTERS FOR DISEASE CONTROL AND PREVENTION, https://emergency.cdc.gov/agent/benzene/basics/facts.asp (last visited Nov. 23, 2021).

11.     However, Defendants' advertising and marketing campaign is false, deceptive, and misleading because the Products contain benzene, which Defendants do not list or mention anywhere on the Products' packaging or labeling.

12.     Plaintiffs and Class Members relied on Defendants' misrepresentations and omissions of what is in the Products when they purchased them.

13.     Consequently, Plaintiffs and Class Members lost the entire benefit of their bargain when what they received was a sunscreen product contaminated with a known carcinogen.

14.     That is because Defendants' Products containing a known human carcinogen have no value.

15.     As set forth below, sunscreen products, such as Defendants' Products, that contain benzene are in no way safe for humans and are entirely worthless.

16.     Accordingly, Defendants' conduct violated and continues to violate, *inter alia*, New York General Business Law §§349 and 350.  Defendants also breached and continue to breach their warranties regarding the Products.  In addition, Defendants have been and continue to be unjustly enriched.  Lastly, Plaintiffs bring a claim for medical monitoring costs associated with testing, monitoring, and remediating the effects of their benzene exposure.

17.     Plaintiffs bring this action against Defendants on behalf of themselves and Class Members who purchased the Products during the applicable statute of limitations period (the "Class Period").

**FACTUAL BACKGROUND**

18.     Sunscreen, also known as sunblock or suntan lotion, is a product Defendants market, advertise, and sell to provide protection against the sun's ultraviolet (UV) rays or radiation.

5

19.     Sunscreens are categorized according to their mechanism of action. There are physical sunscreens which stay on the surface of the skin and deflect the UV rays or light and chemical sunscreens which absorb the UV light.

20.     Since 1974, sunscreens are assigned a Sun Protection Factor ("SPF") which measures the fraction of harmful UV rays or radiation that reach the skin.  For example, the SPF number tells you how long the sun's UV radiation would take to redden your skin when using the product exactly as directed versus the amount of time without any sunscreen.  So ideally, using a product with SPF 30 would take you 30 times longer to burn than if you weren't wearing sunscreen. A product with  SPF 30 allows about 3 percent of UVB rays to hit your skin.  A product with SPF of 50 allows about 2 percent of those rays through.  That may seem like a small difference until you realize that the product with SPF 30 is allowing 50 percent more UV radiation onto your skin than the product with SPF 50.

21.     After initial application to the skin, sunscreens must be reapplied often, typically every 2-3 hours, to continue to protect the skin from UV radiation or rays.

22.     The most common active ingredients in sunscreen products sold in the United States include avobenzone, homosalate, octinoxate, octisalate, octocylene, oxybenzone, titanium dioxide, and zinc oxide.

23.     Sunscreen's products include lotions, sprays, and gels.

24.     Sales of sun care products including sun tan lotions, sprays, and gels have steadily increased as consumers have become more vigilant and health conscious in terms of protecting their skin from the exposure to UV rays or radiation which can cause sunburn and increases the

risk for skin cancer.  As of 2016, the estimated market size of the sun care market was $1.95 billion.[4]

25.     Consumers have become increasingly concerned about the effects of synthetic and chemical ingredients in products that they and their family members put on and/or into their bodies. Companies such as Defendants have capitalized on consumers' desire for healthy and safe products, and indeed, consumers are willing to pay, and have paid, a premium for these products.

26.     Consumers lack the meaningful ability to test or independently ascertain or verify whether a product contains unsafe substances, such as benzene, especially at the point of sale, and therefore must and do rely on Defendants to truthfully and honestly report what the Products contain on the Products' packaging or labels.

27.     The Products' packaging does not identify benzene.  Indeed, benzene is not listed in the ingredients section, nor is there any warning about the inclusion (or even potential inclusion) of benzene in the Products.  This leads reasonable consumers to believe the Products do not contain dangerous chemicals like benzene.

28.     However, despite the fact that the Products' labeling and ingredient listing do not list benzene, the Products contain benzene.

29.     Twenty-first century research has confirmed that there is no safe level of benzene exposure.[5]

---

[4]     *U.S. Sun Care Market Size, Share & Trends Analysis Report, By Product (Self-tanning, After sun, Sun protection), Competitive Landscape, And Segment Forecasts, 2018 – 2025*, GRAND VIEW RESEARCH (Apr. 2018), https://www.grandviewresearch.com/industry-analysis/us-sun-care-market.

[5]     *Advances in Understanding Benzene Health Effects and Susceptibility*, 31 ANNUAL REVIEW OF PUBLIC HEALTH 133 (Apr. 21, 2010), https://www.annualreviews.org/doi/full/10.1146/annurev.publhealth.012809.103646.

30.     Benzene has been recognized, acknowledged, and accepted as a well-known health hazard and human carcinogen for approximately a century.[6]

31.     The National Toxicology Program (hereinafter "NTP") has regarded benzene as "known to be a human carcinogen based on sufficient evidence of carcinogenicity from studies in humans."[7]

32.     The World Health Organization ("WHO") and the International Agency for research on Cancer ("IARC") have classified benzene as a Group 1 compound thereby defining it as "carcinogenic to humans."[8]

33.     The National Institute for Occupational Safety and Health ("NIOSH") recommends protective equipment be worn by workers exposed or expecting to be exposed to benzene at concentrations of 0.1 ppm and defines "inhalation, skin absorption, ingestion, skin and/or eye contact" as exposure routes or paths.[9]

34.     Direct benzene exposure through the skin is particularly concerning.  For example, "[d]irect exposure of the eyes, skin, or lungs to benzene can cause tissue injury and irritation."[10]

35.     Research also has revealed that sunscreen ingredients can be absorbed through the skin into the bloodstream.[11]

---

[6]      *Supra* note 2.

[7]      *Benzene,* Report on Carcinogens, Fourteenth Edition, DEPT. OF HEALTH AND HUMAN SERVICES (Nov. 3, 2016), https://ntp.niehs.nih.gov/ntp/roc/content/profiles/benzene.pdf.

[8]      *Benzene*, IARC MONOGRAPHS ON THE EVALUATION OF CARCINOGENIC RISKS TO HUMANS, Volume 120 (2018), https://publications.iarc.fr/_publications/media/download/6043/20a78ade14e86cf076c3981a9a094f45da6d27cc.pdf.

[9]      *NIOSH Pocket Guide to Chemical Hazards - Benzene*, THE NATIONAL INSTITUTE FOR OCCUPATIONAL SAFETY AND HEALTH (NIOSH), https://www.cdc.gov/niosh/npg/npgd0049.html (last visited Nov. 23, 2021).

[10]     *Supra* note 3.

[11]     Dr. Manavjeet Sidhu, *Sunscreen can be absorbed in the bloodstream, new study says*, ABCNews (Jan. 20, 2020, 8:30 AM), https://abcnews.go.com/Health/sunscreen-absorbed-bloodstream-testing-needed/story?id=68442221 (last visited Nov. 23, 2021).

36.     Moreover, a study by Health Canada's Bureau of Chemical Hazards concluded that "the application of sunscreen specifically increases the absorption rate of benzene through the skin," thereby increasing the risk of harm.[12]

37.     Even low levels of benzene are particularly dangerous in a sunscreen product because "[s]unscreen products are typically used in many times higher volume than standard drug products like tablets or capsules, so even a relatively low concentration limit can result in very high total [benzene] exposure."[13]

38.     Experts in the field of dermatology agree with this assessment.  For example, Christopher Bunick, a professor of dermatology at Yale University has stated:

> Considering that human skin has a large total surface area (~1.85 m2), and that ~28.5 g of sunscreen is needed per application to properly cover that skin surface, it follows then that there is not a safe level of benzene that can exist in sunscreen products. The total mass of sunscreen required to cover and protect the human body, in single daily application or repeated applications daily, means that even benzene at 0.1 ppm in a sunscreen could expose people to excessively high nanogram amounts of benzene.[14]

39.     FDA guidance provides that no level of benzene is safe, and benzene is not permitted in these types of sunscreen products.  The FDA currently recognizes the high danger of this compound and lists it as a "Class 1 solvent" that "should not be employed in the manufacture of drug substances, excipients, and drug products because of their unacceptable toxicity . . . . However, if their use is unavoidable in order to produce a drug product with a significant

---

[12]     *Valisure Detects Benzene in Sunscreen*, VALISURE BLOG (May 25, 2021), https://www.valisure.com/blog/valisure-news/valisure-detects-benzene-in-sunscreen/.

[13]     Letter from Valisure, LLC to the Food and Drug Administration, re: Valisure Citizen Petition on Benzene in Sunscreen and After-sun Care Products (May 24, 2021) (https://www.valisure.com/wp-content/uploads/Valisure-Citizen-Petition-on-Benzene-in-Sunscreen-and-After-sun-Care-Products-v9.7.pdf/) at 16.

[14]     *Id.* at 17.

therapeutic advance, then their levels should be restricted" and benzene is restricted under such guidance to 2 parts per million("ppm").[15]

40.     Additionally, and not surprising, in the FDA's "list of acceptable active ingredients in products that are labeled as sunscreen," benzene is not listed among them.[16]

41.     This is why recent research revealing benzene in Defendants' Products is particularly concerning.

42.     Valisure, LLC (an analytical pharmacy, patient advocacy, and consumer protection organization) ("Valisure") recently published a study ("Study") that found benzene in 43 out of 234 sunscreens and in 8 out of 48 after-sun products.[17]

43.     Valisure found that Defendants' Products contained benzene through its own laboratory testing.[18] Valisure's testing done on the Banana Boat Products revealed widespread benzene contamination.  Although the entire product line was not tested, benzene contamination was revealed through testing of the following products: Kids Max Protect & Play Sunscreen Spray, Kids Sport sunscreen, Protective Dry Oil Clear Sunscreen Spray, Simply Protect Kids (a/k/a Kids Mineral Enriched) Sunscreen Spray, Ultra Defense Ultra Mist Clear Sunscreen Spray, Ultra Sport Clear Sunscreen Spray, and UltraMist Deep tanning Oil Continuous Clear Spray.[19]

---

[15]     *Supra* note 12.

[16]     *Sunscreen: How to Help Protect Your Skin from the Sun,* FOOD AND DRUG ADMIN., https://www.fda.gov/drugs/understanding-over-counter-medicines/sunscreen-how-help-protect-your-skin-sun   (last visited Nov. 23, 2021).

[17]     *Supra* note 12.

[18]     *Supra* note 13.

[19]     *Id*. at 13-15.

| Test Sample | Benzene in sample (ppm) |
|---|---|
| Banana Boat, Kids Max Protect & Play Sunscreen C-Spray SPF 100 | 0.41, 0.43 |
| Banana Boat, UltraMist Deep Tanning Dry Oil Continuous Clear Spray SPF 4 | 0.36 |
| Banana Boat, Kids Max Protect & Play Sunscreen C-Spray SPF 100 | 0.19 |
| Banana Boat, Ultra Sport Clear Sunscreen Spray SPF 100 | 0.15 |
| Banana Boat, Kids Max Protect & Play Sunscreen C-Spray SPF 100 | 0.11 |
| Banana Boat, Protective Dry Oil Clear Sunscreen Spray with Coconut Oil SPF 15 | < 0.1 |
| Banana Boat, Ultra Defense Ultra Mist Clear Sunscreen Spray SPF 100 | < 0.1 |
| Banana Boat, Kids Sport Sunscreen Lotion Spray SPF 50 | < 0.1 |
| Banana Boat, Simply Protect Kids Sunscreen Spray SPF 50+ | < 0.1 |

[20]

44.     For reference, the National Institute for Occupational Safety and Health ("NIOSH") recommends protective equipment be worn by workers expecting to be exposed to benzene at concentrations of 0.10 ppm and defines "skin absorption" as an exposure route.[21]

45.     According to the World Health Organization, there is "no safe level of [benzene] exposure[.]"[22]

46.     Plaintiffs' independent testing has also established benzene in impermissible levels in the Products:

Table 2:  GC-MS Benzen Analysis Test Results of the Samples

| Test Sample | GC-MS Peak Area from Benzene | Benzene in Sample (ppm) |
|---|---|---|
| Banana Boat Kids Max Clear Sunscreen Spray, 100 | 10,108 | 1.99 |
| Banana Boat, Protective Dry Oil, Clear Sunscreen Spray, 15 with Coconut Oil | 11,447 | 2.20 |

---

[20] *Id.*

[21] NIOSH Pocket Guide to Chemical Hazards - Benzene, THE NATIONAL INSTITUTE FOR OCCUPATIONAL SAFETY AND HEALTH (NIOSH), https://www.cdc.gov/niosh/npg/npgd0049.html

[22] Exposure to Benzene: A Major Public Health Concern, WORLD HEALTH ORG., (2010), https://www.who.int/ipcs/features/benzene.pdf

47.     Moreover, because the majority of the products Valisure tested did not contain detectable levels of benzene, its use is not "unavoidable" in order to achieve the therapeutic benefits of sunscreen.

48.     In fact, Defendants could avoid exposing Plaintiffs and the Class to benzene in the manufacturing process and the Products could have been sold with absolutely no benzene in them.[23]

49.     Valisure investigated the possibility that benzene occurred due to the natural degradation of sunscreen's active ingredients and determined that it did not. Thus, the presence of benzene in the sunscreen products is likely due to contamination during the manufacturing process.[24]

50.     Benzene was not listed as an active ingredient on the Products labels nor did the Products labels inform and/or warn the consumer of the benzene contamination or risk of benzene contamination.

51.     Therefore, Defendants' false, misleading, and deceptive misrepresentations and omissions regarding the ingredients of the Products are likely to continue to deceive and mislead reasonable consumers and the public, as they have already deceived and misled Plaintiffs and the Class Members.

52.     Defendants' concealment was material and intentional because people are concerned with what is in the products that they are putting onto and into their bodies. Consumers such as Plaintiffs and the Class Members are influenced by the ingredients listed. Defendants

---

[23] *See supra* note 13 at 2.

[24] *Id*. at 7-8.

know that if it had not omitted that the Products contained benzene, then Plaintiffs and the Class would not have purchased the Products at all.

53.    Defendants Products are also adulterated, misbranded, and/or constitute unapproved new drugs, in violation of federal and state law, rendering them worthless.

54.    Notably, a number of Defendant's competitors responded to the Valisure testing by issuing voluntary recalls of their sunscreen products. Johnson & Johnson, for example, acknowledged the presence of benzene in their products, and recalled various products so it could investigate the source of the benzene.

55.    Defendant has not recalled the Products, and upon information and belief continues to omit any reference to benzene on the Products' labels.

56.    Plaintiffs bring claims under various state consumer and warranty theories and are not seeking to enforce any federal statute or regulation; however, much of the conduct giving rise to Plaintiffs' claims was likewise in violation of the Federal Food, Drug, and Cosmetics Act, 21 U.S.C. § 301, et seq. ("FFDCA") and its implementing regulations.

57.    Most sunscreens, including the Products, are considered drugs that are regulated by the U.S. Food and Drug Administration ("FDA").

58.    They are therefore subject to the FFDCA and its implementing regulations.  These include, *inter alia*, the FFDCA's provisions regarding misbranded drugs, adulterated drugs, and nonprescription over-the-counter ("OTC") drugs that may be marketed without an approved drug application.  21 U.S.C. §§ 351, 352, 355h.

59.    Under the FFDCA and its implementing regulations, Defendants' Products constitute misbranded drugs, adulterated drugs, and/or unapproved new drugs that do not meet the general requirements for nonprescription drugs to be marketed without an approved application.

60.     The manufacture of any misbranded or adulterated drug is prohibited under federal law. 21 U.S.C § 331(g).

61.     The introduction or delivery for introduction into interstate commerce (or receipt thereof) of any misbranded or adulterated drug is prohibited under federal law.  21 U.S.C. § 331(a),(c).

62.     Further, the introduction or delivery for introduction into interstate commerce of a purported nonprescription OTC drug that fails to meet the OTC drug requirements is prohibited under federal law. 21 U.S.C §§ 355(a) and 331(d).

63.     Defendants' Products are 'misbranded' under 21 U.S.C. § 352 and the relevant regulations.

64.     It is similarly misbranded under the applicable regulations, which state, in part, that an OTC drug "is generally recognized as safe and effective and is not misbranded if it meets each of the conditions contained in [21 C.F.R. §§ 330.1 – 330.15] and each of the conditions contained in any applicable monograph." 21 C.F.R. § 330.1. The general regulations also incorporate the statutory language, providing that a drug is misbranded where it is not "labeled in compliance with chapter V of the Federal Food, Drug, and Cosmetic Act[.]" 21 C.F.R. § 330.1(c)(1).

65.     21 U.S.C. § 352(a)(1) provides that a drug shall be deemed to be misbranded under the FFDCA if, *inter alia,* if "its labeling is false or misleading in any particular."

66.     Further, "[i]f an article is alleged to be misbranded because the labeling…is misleading, then in determining whether the labeling…is misleading there shall be taken into account (among other things) not only representations made or suggested by statement [or] word,…but also the extent to which the labeling…fails to reveal facts material in the light of such

representations or material with respect to consequences which may result from the use of the article…under such conditions of use as are customary or usual." 21 U.S.C. § 321(n).

67.     Here, the Defendant has violated 21 U.S.C. § 352(a)(1) rendering the Products "misbranded."

68.     The Products' labeling (in the ingredients list or otherwise) fails to reveal that the Products contain or may contain benzene. The absence of this disclosure conveys that benzene is not in the product, but Plaintiffs own and independent third-party testing had confirmed that is not true.

69.     The omission that the Products contain or may contain a dangerous carcinogen is a material fact for any consumer item, and especially so for a product that is purchased for the purposes of promoting health and preventing cancer, and is to be used liberally and reapplied often.

70.     Exposure or potential exposure to carcinogens is even more material given that other products which offer the same protection are carcinogen-free.

71.     21 U.S.C. § 352(e)(1)(A)(iii) provides that a drug is also misbranded under the FFDCA "[i]f it is a drug, unless its label bears[, *inter alia*,] the established name of each inactive ingredient listed in alphabetical order on the outside container of the retail package." The regulations incorporate the same, mandating disclosure of "[t]he ingredient information required by [21 USC § 352(e)]" of the FFDCA. 21 C.F.R. § 201.10(a).[25]

72.     The regulations similarly provide, as part of the label's content requirements, that the label discloses the "'inactive ingredients' followed by a listing of the established name of each inactive ingredient." 21 C.F.R. § 201.66(c)(8).

---

[25] The FFDCA requires a label to list, *inter alia*, "the established name and quantity of…each active ingredient" as well as "the established name of each inactive ingredient[.]" 21 U.S.C. § 352(e)(ii), (iii).

73.    Part 201 (which governs labeling) defines "active ingredient" as "any component that is intended to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body of humans." 21 C.F.R. § 201.66(b)(2). "Inactive ingredient means any component other than an active ingredient." 21 C.F.R. § 201.66(b)(8).

74.    While 'component' as it is used in Part 201 is not defined, Part 201 specifies that with respect to a finished product's label ingredient list, "[t]he term ingredient applies to any substance in the drug[.]" 21 C.F.R. § 201.10(b). Thus, OTC drugs as they are delivered to consumers may only contain "active ingredients" or "inactive ingredients."

75.    Further, a substance that is present in some, but not all, bottles of a drug product should still be listed as an "inactive ingredient" if a manufacturer were to, as here, use a uniform ingredients list.

76.    In its OTC Labeling Guidance, when discussing 21 C.F.R. § 201.66(c)(8)'s "inactive ingredient" requirement, FDA explains:

**E. Inactive ingredients: "contains one or more of these ingredients" labeling.**

There may be circumstances when manufacturers, packers, and distributors who market OTC drug products use multiple suppliers for some drug products to maintain an uninterrupted supply of the drug product to their customers. In such cases, the specific inactive ingredients in the drug products may vary slightly from supplier to supplier: some inactive ingredients may be present in drug products coming from all suppliers while other inactive ingredients may not be present. To have one label for all drug products, we recommend that the ingredients that may (or may not) be contained in each individual drug product be listed on the labeling in the following manner.

•   We believe that this type of inactive ingredient labeling can be accomplished best by placing those ingredients that may (or may not) be contained in an OTC drug product in the inactive ingredient listing, as set forth in § 201.66(c)(8), with an asterisk placed next to those ingredients (e.g., acacia*, dextrose*, sucrose, xanthum gum*). The asterisk would then be reprinted at the

bottom or end of the inactive ingredient section in the Drug Facts box with the notation "* contains one or more of these ingredients" (if more than one ingredient may (or may not) be in the drug product), or "* may contain this ingredient" (if only one ingredient may (or may not) be in the drug product), whichever is appropriate.

….

Manufacturers, packers, and distributors are also reminded to follow all applicable current good manufacturing practice regulations in 21 CFR part 211 for finished pharmaceuticals so that manufacturers maintain appropriate records showing which lot numbers of the drug product contain which inactive ingredients.

FDA, Guidance for Industry: Labeling OTC Human Drug Products (May 2009) at 9, 12-13, avail. at https://www.fda.gov/media/76481/download.

77.     Thus, had Defendants followed FDA's guidance, it would have at least included benzene in the inactive ingredients list with a "may contain this ingredient" asterisk.  Since Defendants chose to use uniform ingredient labeling in all lots of the Products, it was required to make this disclosure, which it failed to do.

78.     Here,  Defendants have violated 21 U.S.C. § 352(e) and/or related regulations, rendering the Products 'misbranded.'

79.     Benzene is a substance found in Defendants' Products by independent, third-party testing as well as Plaintiffs' own testing.  Defendants' competitors (but not Defendant) have sought fit to issue recalls pulling their sunscreen products off the market.

80.     Upon information and reasonable belief, benzene is not an "active ingredient" in Defendant's Product as it does not (nor could be intended to) provide protection from UV rays. Nor is benzene on the FDA's list of approved active ingredients for sunscreen products.

81.     Benzene is therefore an inactive ingredient, yet Defendant unlawfully omitted it as such on the Products' labels.  Defendant should have included benzene in the "inactive ingredients" panel, with or without a "may contain this ingredient" asterisk, as appropriate.

82.     Alternatively, even if benzene were not required to be listed as an inactive ingredient, 21 U.S.C. § 352(j) provides that a drug is also misbranded under the FFDCA if "it is dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof."

83.     Here, Defendants have violated 21 U.S.C. § 352(j), rendering the Products "misbranded."

84.     As described herein, consumer use of sunscreen has grown steadily.  Further, sunscreen products typically instruct users to apply sunscreen liberally and reapply often.

85.     Further, "recent studies by FDA researchers have shown that significant amounts of sunscreen ingredients absorb through the skin and are found in the blood; specifically, over 400 times the threshold for systemic carcinogenicity assessment for at least one sunscreen active ingredient."[26]

86.     Given that the Products are to be applied liberally and frequently, and given that carcinogen-free sunscreens exist offering the same therapeutic benefit, utilizing a sunscreen containing benzene creates a completely avoidable and unreasonable risk, and is dangerous to one's health.

87.     This is consistent with FDA's approach to the use of benzene in drug manufacturing. Recognizing benzene's industrial use as a solvent, FDA has advised drug manufacturers to avoid using benzene, which it classifies as a "known human carcinogen" and "Class 1 solvent…to be avoided[.]"

88.     In its non-binding guidance as to residual solvents (solvents that remain as impurities in finished drug products), FDA explains:

---

[26] May 24, 2021, Valisure Citizens Petition, at pg. 2, avail. At https://www.valisure.com/wpcontent/uploads/Valisure-Citizen-Petition-on-Benzene-in-Sunscreen-and-After-sun-Care-Products-v9.7.pdf. (see pg. 2).

## IV. LIMITS OF RESIDUAL SOLVENTS

### A. Solvents to Be Avoided

Solvents in Class 1 (Table 1; see companion document) should not be employed in the manufacture of drug substances, excipients, and drug products because of their unacceptable toxicity or their deleterious environmental effect. However, if their use is unavoidable in order to produce a drug product with a significant therapeutic advance, then their levels should be restricted as shown in Table 1, unless otherwise justified

FDA, Guidance for Industry: Q3C Impurities: Residual Solvents (Dec. 1997), avail. at https://www.fda.gov/media/71736/download, at 6 (emphasis in original).

89.     Insofar as the benzene in Defendants' Products was intentionally utilized or was a residual solvent impurity, since its use was not unavoidable, its presence at any level presents an unacceptable toxicity, rendering the product dangerous.

90.     Accordingly, the Products are 'misbranded' under the FFDCA.

**ii. Defendant's Products are "adulterated" under 21 U.S.C. § 352 and the relevant regulations.**

91.     In addition to (or in the alternative to) being "misbranded" under 21 U.S.C. § 352, Defendant's Products are "adulterated" under 21 U.S.C. § 351 and related regulations.

92.     21 U.S.C. § 351(a)(1) provides that a drug shall deemed to be adulterated under the FFDCA if, *inter alia,* "it consists in whole or in part of any filthy, putrid, or decomposed substance[.]"

93.     Defendants' Products consist in part of benzene, an inherently volatile and unstable compound subject to rapid decomposition.

94.     The inherent nature of benzene aside, insofar as the benzene exists as an impurity or contaminant (rather than an intentional ingredient), its presence in the Products exist as a filthy, putrid, and/or decomposed substance.

95.     21 U.S.C. § 351(a)(2)(A) provides that a drug is also adulterated under the FFDCA "if it has been prepared, packed, or held under insanitary conditions…whereby it may have been rendered injurious to health[.]" Similarly, a drug is also adulterated "if its container is composed, in whole or in part, of any poisonous or deleterious substance which may render the contents injurious to health[.]" 21 U.S.C. § 351(a)(3).

96.     If it is the case that the benzene in Defendant's Products was not added intentionally to the sunscreen formulation, it follows that the benzene exists due to either contamination or the failure to remove impurities.

97.     With respect to potential contamination, the undisputed discovery of benzene in Defendants' Products (if not intentional) evidences that the Products were either manufactured, packaged, or stored under conditions where they, at the very least, may have been rendered injurious to health.  This renders the Products adulterated, regardless of whether those conditions resulted in benzene contamination in every single product bottle.

98.     Alternatively, if the presence of benzene is that of an impurity (left over after its use as a solvent during the manufacturing process), the mere decision to utilize benzene (as opposed to other equally effective, less harmful, and non-carcinogenic chemicals) amounts to preparing the Products in a way whereby they may be rendered injurious to health.

99.     As noted *supra*, this is essentially the position taken by FDA in its guidance documents: that benzene "should not be employed in the manufacture of" the Products "because of [the chemical's] unacceptable toxicity."

100.    In the further alternative, even if the decision of Defendant or one of its agents to utilize benzene as a solvent does not amount to preparing the sunscreen in a way potentially

rendering in injurious to health, the failure to utilize adequate procedures to remove impurities during the manufacturing process amounts to precisely that.

101.    21 U.S.C. § 351(a)(2)(B) provides that a drug is also adulterated under the FFDCA if "the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug…has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess[.]"

102.    The general regulations governing OTC drugs clarify that OTC drugs must be "manufactured in compliance with current good manufacturing practices, as established by [21 C.F.R.] parts 210 and 211." 21 C.F.R. § 330.1(a); *see also* 21 C.F.R. § 330.1(f) ("[t]he product container and container components meet the requirements of [21 C.F.R.] § 211.94"). "The failure to comply with any regulation set forth in [Parts 210 and 211] in the manufacture, processing, packing, or holding of a drug shall render such drug to be adulterated under [21 U.S.C. § 351(a)(2)(B)]." 21 C.F.R. § 210.1(b).

103.    Insofar as benzene-a harmful carcinogen-made its way into Defendants' Products by accident, it follows that it was due to poor manufacturing processes by either Defendants or its agents.  Further evidencing this fact, Defendants' competitors that have issued recalls following Valisure's testing of their products have announced they are investigating how exactly the benzene contamination may have occurred, and they acknowledge that it should not have happened.

104.    Accordingly, the Products are 'adulterated' under the FFDCA.

**iii. Defendant's Products do not meet the general requirements for nonprescription drugs to be marketed without an approved application.**

105.    In addition to (or in the alternative) to being "misbranded" and/or "adulterated" under 21 U.S.C. §§ 351-352, Defendants' Products are an unapproved new drug marketed in violation of 21 U.S.C. §§ 331 and 355.

106.    21 U.S.C. § 355h sets forth the requirements for marketing nonprescription OTC drugs without an approved new drug application, and OTC drugs failing to meet those requirements are rendered unapproved new drugs marketed in violation of 21 U.S.C §§ 355(a) and 331(d).

107.    In other words, to avail themselves of the privilege of bringing new OTC drugs to market without applying for FDA approval, certain conditions must be met.  If a manufacturer is unable to meet those conditions, then it must follow the FDA's more burdensome procedure of submitting an application for FDA approval.  If a manufacturer who does not meet the conditions nevertheless brings its drug to market, it is rendered an illegal unapproved new drug.

108.    Among those requirements are that the OTC drug is "in conformity with the requirements for nonprescription use of [any applicable] final monograph [and] the general requirements for nonprescription drugs" provided at 21 C.F.R. § 330.1.

109.    As explained above, one or more of the portions of 21 C.F.R. § 330.1 dealing with misbranding and adulteration were violated by Defendants.  *See supra*  63, 101 (discussing 21 C.F.R. §§ 330.1(a), (c)(1), (f)).

110.    Further, 21 C.F.R. § 330.1 provides another requirement for OTC drugs implicated here, that "[t]he product contains only suitable inactive ingredients which are safe in the amounts administered[.]" 21 C.F.R. § 330.1(e).  A suitable inactive ingredient generally provides a benefit in terms of the drug formulation (such as a delayed-release mechanism in a prescription drug).

111.    As discussed herein, *supra* 70-76, the benzene was an inactive ingredient in Defendants' Products, warranting its inclusion on the ingredients panel (with a "may contain this ingredient" qualifier at best).

112.    Benzene is not a "suitable" inactive ingredient.  Upon information and belief, the benzene serves no beneficial purpose in the drug.

113.    Nor is benzene a "safe" inactive ingredient given its carcinogenic properties and its status as a Class I solvent that should not be used where, as here, a non-carcinogenic substitute was available.

114.    Therefore, Defendant's Products are unapproved new drugs marketed in violation of 21 U.S.C §§ 355(a) and 331(d).

### iv. The sunscreen monograph

115.    The general conditions for OTC drugs to be considered generally safe and not misbranded mandate compliance with, *inter alia,* any applicable monograph.  *See, e.g.,* 21 C.F.R. §§ 330.1.

116.    The "applicable monograph" for sunscreen is OTC Monograph M020, which combines 21 C.F.R. part 352 and 21 C.F.R. 201.327 into one order and includes minor technical amendments to facilitate the combination thereof.   See FDA, Final Administrative Order OTC000006, Over-the-Counter Monograph M020: Sunscreen Drug Products for Over-the-Counter Human Use (Sep. 24, 2021), avail. at https://www.accessdata.fda.gov/drugsatfda_docs/omuf/OTCMonograph_M020-SunscreenDrugProductsforOTCHumanUse09242021.pdf ("Sunscreen Order"), at 1-2.

117.    The Sunscreen Order's section entitled "Scope" provides that "[a]n over- the-counter (OTC) sunscreen drug product in a form suitable for topical administration is generally

recognized as safe and effective and is not misbranded if it meets each condition in this OTC monograph and each general condition established in 21 CFR 330.1." Sunscreen Order § M020.1-Scope.

118.    Thus, the Sunscreen Order acknowledges that a sunscreen product can meet each condition in the Sunscreen Order and nevertheless not generally be recognized as safe and effective and misbranded if it fails to meet each general condition established in 21 C.F.R. § 330.1.

119.    Further, the scope of the Sunscreen Order does not reach adulteration, and its labeling provisions are largely focused on efficacy and SPF ratings.

120.    The specific provisions of the Sunscreen Order are largely irrelevant with respect to Plaintiffs' claims, involving permitted active ingredients (Part B), additional labeling requirements specific to sunscreen that supplement (but do not replace) the general OTC regulations (Part C), and SPF testing procedures (Part D).

## JURISDICTION AND VENUE

121.    This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. section §1332(d) in that (1) this is a class action involving more than 100 class members; (2) Plaintiff Chabla is a citizen of New York, Plaintiff Barton is a citizen of New York, Defendant Edgewell Personal Care Brands, LLC is a citizen of Connecticut, Defendant Edgewell Personal Care, LLC is a citizen of Connecticut, and Defendant Sun Pharmaceuticals, LLC is a citizen of Connecticut; and (3) the amount in controversy is in excess of $5,000,000, exclusive of interests and costs.

122.    This Court has personal jurisdiction over Defendants because Defendants conduct and transact business in the state of Connecticut, contract to supply goods within the state of Connecticut, and supply goods within the state of Connecticut.

123.    Venue is proper because Defendants are headquartered and reside in the state of Connecticut.   A substantial part of the events or omissions giving rise to the Classes' claims occurred in this district.

## PARTIES

### Plaintiffs

124.    Plaintiff Luis Chabla is a citizen and resident of the state of New York.   During the applicable statute of limitations period, Plaintiff purchased Defendants' Products that contained benzene, including, but not limited to, the Banana Boat Protective Dry Oil Clear Sunscreen Spray with Coconut Oil SPF 15.

125.    Plaintiff Jessica Barton is a citizen and resident of the state of New York.   During the applicable statute of limitations period, Plaintiff purchased Defendants' Products that contained benzene, including, but not limited to, the Banana Boat UltraMist Deep Tanning Dry Oil Continuous Clear Spray SPF 4 and Banana Boat Ultra Sport Clear Sunscreen Spray SPF 100.

126.    Had Defendants not made the false, misleading, and deceptive representations and omissions regarding the Products containing benzene, Plaintiffs would not have been willing to purchase the Products.   Plaintiffs purchased, purchased more of, and/or paid more for, the Products than they would have had they known the truth about the Products.   The Products Plaintiffs received were worthless because they contain the known carcinogen benzene.   Accordingly, Plaintiffs were injured in fact and lost money as a result of Defendants' improper conduct.

### Defendants

127.    Defendant Edgewell Personal Care Brands, LLC is a Delaware Limited Liability Corporation with its headquarters in Shelton, Connecticut.   Edgewell Personal Care Brands, LLC conducts business throughout the United States, including this district.   Edgewell Personal Care

Brands, LLC is a wholly owned subsidiary of and/or 100% controlled by Edgewell Personal Care Company, which is also responsible for the manufacturing, marketing, advertising, and distributing of the Products.

128.    Defendant Edgewell Personal Care, LLC is a Delaware Limited Liability Corporation with its headquarters in Shelton, Connecticut.  Edgewell Personal Care, LLC conducts business throughout the United States, including this district.  Edgewell Personal Care, LLC is a wholly owned subsidiary of and/or 100% controlled by Edgewell Personal Care Company, which is also responsible for the manufacturing, marketing, advertising, and distributing of the Products.

129.    Defendant Sun Pharmaceuticals, LLC is a Delaware limited liability company with its headquarters and principal place of business located in Shelton, Connecticut.   Sun Pharmaceuticals, LLC conducts business throughout the United States, including this district.  Sun Pharmaceuticals, LLC is a subsidiary of Edgewell Personal Care Company and is also responsible for the manufacturing, marketing, advertising, and distributing of the Banana Boat sunscreen products.

130.    Defendants' manufacture, market, advertise, and distribute the Products throughout the United States.  Defendants created and/or authorized the false, misleading, and deceptive advertisements, packaging, and labeling of their Products.

## **CLASS ALLEGATIONS**

131.    Plaintiffs bring this matter on behalf of themselves and those similarly situated.  As detailed at length in this Complaint, Defendants orchestrated deceptive marketing and labeling practices.  Defendants' customers were uniformly impacted by and exposed to this misconduct. Accordingly, this Complaint is uniquely situated for class-wide resolution, including injunctive relief.

132.    The Class is defined as all consumers who purchased the Products anywhere in the United States during the Class Period.

133.    Plaintiffs also seek certification, to the extent necessary or appropriate, of a subclass of individuals who purchased the Products in the state of New York at any time during the Class Period (the "New York Subclass").

134.    The Class and New York Subclass shall be referred to collectively throughout the Complaint as the Class.

135.    The Class is properly brought and should be maintained as a class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy because:

136.    Numerosity: Class Members are so numerous that joinder of all members is impracticable.  Plaintiffs believe that there are thousands of consumers in the Class and the New York Class who are Class Members as described above who have been damaged by Defendants' deceptive and misleading practices.

137.    Commonality: The questions of law and fact common to the Class Members predominate over any questions which may affect individual Class Members include, but are not limited to:

a.    whether Defendants are responsible for the conduct alleged herein, which was uniformly directed at all consumers who purchased the Products;

b.    whether Defendants' misconduct set forth in this Complaint demonstrates that Defendants have engaged in unfair, fraudulent, or unlawful business practices with respect to the advertising, marketing, and sale of their Products;

c.      whether Defendants made false and/or misleading statements and omissions to the Class and the public concerning the contents of their Products;

d.      whether Defendants' false and misleading statements and omissions concerning their Products were likely to deceive the public; and

e.      whether Plaintiffs and the Class are entitled to money damages under the same causes of action as the other Class Members.

138.    Typicality: Plaintiffs are members of the Class.  Plaintiffs' claims are typical of the claims of each Class Member in that every member of the Class was susceptible to the same deceptive and misleading conduct and purchased Defendants' Products.  Plaintiffs are entitled to relief under the same causes of action as the other Class Members.

139.    Adequacy: Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the Class Members they seek to represent, their consumer fraud claims are common to all members of the Class, they have a strong interest in vindicating their rights, they have retained counsel competent and experienced in complex class action litigation, and counsel intends to vigorously prosecute this action.

140.    Predominance: Pursuant to Rule 23(b)(3), common issues of law and fact identified above predominate over any other questions affecting only individual members of the Class.  The Class issues fully predominate over any individual issues because no inquiry into individual conduct is necessary; all that is required is a narrow focus on Defendants' deceptive and misleading marketing and labeling practices.

141.    Superiority: A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because:

a.      the joinder of thousands of individual Class Members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation resources;

b.      the individual claims of the Class Members may be relatively modest compared with the expense of litigating the claims, thereby making it impracticable, unduly burdensome, and expensive – if not totally impossible – to justify individual actions;

c.      when Defendants' liability has been adjudicated, all Class Members' claims can be determined by the Court and administered efficiently in a manner far less burdensome and expensive than if it were attempted through filing, discovery, and trial of all individual cases;

d.      this class action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of Class claims;

e.      Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action;

f.      this class action will assure uniformity of decisions among Class Members;

g.      the Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation;

h.      Class Members' interests in individually controlling the prosecution of separate actions is outweighed by their interest in efficient resolution by single class action; and

i.      it would be desirable to concentrate in this single venue the litigation of all Class Members who were induced by Defendants' uniform false advertising to purchase their Products.

131.    Accordingly, this Class is properly brought and should be maintained as a class action under Rule 23(b)(3) because questions of law or fact common to Class Members predominate over any questions affecting only individual members, and because a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

## INJUNCTIVE CLASS RELIEF

132.    Rules 23(b)(1) and (2) contemplate a class action for purposes of seeking class-wide injunctive relief.   Here, Defendants have engaged in conduct resulting in misleading consumers about ingredients in the Products.   Since Defendants' conduct has been uniformly directed at all consumers in the United States, and the conduct continues presently, injunctive relief on a class-wide basis is a viable and suitable solution to remedy Defendants' continuing misconduct.   Plaintiffs would purchase the Products again if they did not include benzene.

133.    The injunctive Class is properly brought and should be maintained as a class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy because:

a.    Numerosity: Individual joinder of the injunctive Class Members would be wholly impracticable.  Defendants' Products have been purchased by thousands of people throughout the United States.

b.    Commonality: Questions of law and fact are common to members of the Class.   Defendants' misconduct was uniformly directed at all consumers.   Thus, all members of the Class have a common cause against Defendants to stop their misleading conduct through an injunction.   Since the issues presented by this injunctive Class deal exclusively with Defendants' misconduct, resolution of these questions would necessarily

be common to the entire Class.  Moreover, there are common questions of law and fact inherent in the resolution of the proposed injunctive class, including, *inter alia*:

       i.     resolution of the issues presented in the 23(b)(3) class;

       ii.    whether members of the Class will continue to suffer harm by virtue of Defendants' deceptive product marketing and labeling; and

       iii.   whether, on equitable grounds, Defendants should be prevented from continuing to deceptively mislabel the Products.

    c.     <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the injunctive Class because their claims arise from the same course of conduct (*i.e.*, Defendants' deceptive and misleading marketing, labeling, and advertising practices).  Plaintiffs are typical representatives of the Class because, like all members of the injunctive Class, they purchased Defendants' Products, which were sold unfairly and deceptively to consumers throughout the United States.

    d.     <u>Adequacy</u>: Plaintiffs will fairly and adequately represent and protect the interests of the injunctive Class.  Their consumer protection claims are common to all members of the injunctive class and they have a strong interest in vindicating their rights.  In addition, Plaintiffs and the Class are represented by counsel who are competent and experienced in both consumer protection and class action litigation.

134.   Plaintiffs seek injunctive relief on behalf of the Class Members on grounds generally applicable to the entire injunctive Class, and Defendants have acted or refused to act in a manner that applies generally to the injunctive Class (*i.e.*, Defendants have marketed their Products using the same misleading and deceptive labeling to all of the Class Members).

135.     Plaintiffs also seek to include an injunction to require the implementation and funding of a blood serum testing program for the Plaintiffs and Class Members to test for the presence of benzene in their blood serum; and the implementation and funding of a medical monitoring program for Plaintiffs and Class Members sufficient to monitor Plaintiffs' and Class Members' health to ensure they are adequately monitored for the harmful effects of benzene in the human body.

136.     Any final injunctive relief or declaratory relief would benefit the entire injunctive Class as Defendants would be prevented from continuing their misleading and deceptive marketing practices and would be required to honestly disclose to consumers the true nature of the contents of the Products.

## CLAIMS

### FIRST CAUSE OF ACTION
### VIOLATION OF NEW YORK GBL §349
**(On Behalf of Plaintiffs and New York Subclass Members)**

137.     Plaintiffs repeat and reallege each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

138.     New York General Business Law Section 349 ("GBL §349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state . . . ."

139.     The conduct of Defendants alleged herein constitutes recurring, "unlawful" deceptive acts and practices in violation of GBL §349, and as such, Plaintiffs and the New York Subclass Members seek monetary damages against Defendants, enjoining them from inaccurately describing, labeling, marketing, and promoting the Products.

140.     There is no adequate remedy at law.

141.   Defendants misleadingly, inaccurately, and deceptively advertise and market their Products to consumers.

142.   Defendants' improper consumer-oriented conduct – including failing to disclose that the Products have benzene – is misleading in a material way in that it, *inter alia*, induced Plaintiffs and the New York Subclass Members to purchase Defendants' Products and to use the Products when they otherwise would not have.  Defendants made the untrue and/or misleading statements and omissions willfully, wantonly, and with reckless disregard for the truth.

143.   Plaintiffs and the New York Subclass Members have been injured inasmuch as they purchased products that were mislabeled, unhealthy, and entirely worthless.  Accordingly, Plaintiffs and the New York Subclass Members received less than what they bargained and paid for.

144.   Defendants' advertising and the Products' packaging and labeling induced Plaintiffs and the New York Subclass Members to buy Defendants' Products.

145.   Defendants' deceptive and misleading practices constitute a deceptive act and practice in the conduct of business in violation of New York General Business Law §349(a) and Plaintiffs and the New York Subclass Members have been damaged thereby.

146.   As a result of Defendants' recurring, "unlawful" deceptive acts and practices, Plaintiffs and the New York Subclass Members are entitled to monetary, statutory, compensatory, treble and punitive damages, restitution, and disgorgement of all moneys obtained by means of Defendants' unlawful conduct, interest, and attorneys' fees and costs.

## SECOND CAUSE OF ACTION
## VIOLATION OF NEW YORK GBL §350
### (On Behalf of Plaintiffs and the New York Subclass Members)

147.    Plaintiffs repeat and reallege each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

148.    N.Y. Gen. Bus. Law §350 provides, in part, as follows:

False advertising in the conduct of any business, trade, or commerce or in the furnishing of any service in this state is hereby declared unlawful.

149.    N.Y. Gen. Bus. Law §350a(1) provides, in part, as follows:

The term "false advertising" means advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect.  In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual.

150.    Defendants' labeling and advertisements contain untrue and materially misleading statements and omissions concerning its Products inasmuch as they misrepresent that the Products are safe for use and don't list that the Products contain benzene.

151.    Plaintiffs and the New York Subclass Members have been injured inasmuch as they relied upon the labeling, packaging, and advertising and purchased Products that were mislabeled, unhealthy, and entirely worthless.  Accordingly, Plaintiffs and the New York Subclass Members received less than what they bargained and paid for.

152.    Defendants' advertising, packaging, and the Products' labeling induced Plaintiffs and the New York Subclass Members to buy Defendants' Products.

153.    Defendants made their untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

154.    Defendants' conduct constitutes multiple, separate violations of N.Y. Gen. Bus. Law §350.

155.    Defendants made the material misrepresentations described in this Complaint in its advertising and on the Products' packaging and labeling.

156.    Defendants' material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large.  Moreover, all consumers purchasing the Products were and continue to be exposed to Defendants' material misrepresentations.

157.    As a result of Defendants' recurring, "unlawful" deceptive acts and practices, Plaintiffs and New York Subclass Members are entitled to monetary, statutory, compensatory, treble and punitive damages, restitution, and disgorgement of all moneys obtained by means of Defendants' unlawful conduct, interest, and attorneys' fees and costs.

### THIRD CAUSE OF ACTION
### BREACH OF EXPRESS WARRANTY
**(On Behalf of Plaintiffs and All Class Members)**

158.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

159.    Defendants provided Plaintiffs and Class Members with an express warranty in the form of written affirmations of fact promising and representing that the Products are safe for use and do not contain benzene.

160.    The above affirmations of fact were not couched as "belief" or "opinion" and were not "generalized statements of quality not capable of proof or disproof."

161.    These affirmations of fact became part of the basis for the bargain and were material to Plaintiffs and Class Members' transactions.

162.    Plaintiffs and Class Members reasonably relied upon Defendants' affirmations of fact and justifiably acted in ignorance of the material facts omitted or concealed when they decided to buy Defendants' Products.

163.    Defendants knowingly breached the express warranties by including benzene in the Products sold to Plaintiffs and the Class without properly notifying them of their inclusion in the Products.

164.    Within a reasonable time after it knew or should have known, Defendants did not change the Products' labels to include benzene in the ingredient list.

165.    Defendants thereby breached the following state warranty laws:

  a.  Code of Ala. § 7-2-313;

  b.  Alaska Stat. § 45.02.313;

  c.  A.R.S. § 47-2313;

  d.  A.C.A. § 4-2-313;

  e.  Cal. Comm. Code § 2313;

  f.  Colo. Rev. Stat. § 4-2-313;

  g.  Conn. Gen. Stat. § 42a-2-313;

  h.  6 Del. C. § 2-313;

  i.  D.C. Code § 28:2-313;

  j.  Fla. Stat. § 672.313;

  k.  O.C.G.A. § 11-2-313;

  l.  H.R.S. § 490:2-313;

m.      Idaho Code § 28-2-313;

n.      810 I.L.C.S. 5/2-313;

o.      Ind. Code § 26-1-2-313;

p.      Iowa Code § 554.2313;

q.      K.S.A. § 84-2-313;

r.      K.R.S. § 355.2-313;

s.      11 M.R.S. § 2-313;

t.      Md. Commercial Law Code Ann. § 2-313;

u.      106 Mass. Gen. Laws Ann. § 2-313;

v.      M.C.L.S. § 440.2313;

w.      Minn. Stat. § 336.2-313;

x.      Miss. Code Ann. § 75-2-313;

y.      R.S. Mo. § 400.2-313;

z.      Mont. Code Anno. § 30-2-313;

aa.     Neb. Rev. Stat. § 2-313;

bb.     Nev. Rev. Stat. Ann. § 104.2313;

cc.     R.S.A. 382-A:2-313;

dd.     N.J. Stat. Ann. § 12A:2-313;

ee.     N.M. Stat. Ann. § 55-2-313;

ff.     N.Y. U.C.C. Law § 2-313;

gg.     N.C. Gen. Stat. § 25-2-313;

hh.     N.D. Cent. Code § 41-02-30;

ii.     II. O.R.C. Ann. § 1302.26;

jj.     12A Okl. St. § 2-313;

kk.    Or. Rev. Stat. § 72-3130;

ll.     13 Pa. Rev. Stat. § 72-3130;

mm.   R.I. Gen. Laws § 6A-2-313;

nn.    S.C. Code Ann. § 36-2-313;

oo.    S.D. Codified Laws, § 57A-2-313;

pp.    Tenn. Code Ann. § 47-2-313;

qq.    Tex. Bus. & Com. Code § 2.313;

rr.     Utah Code Ann. § 70A-2-313;

ss.    9A V.S.A. § 2-313;

tt.     Va. Code Ann. § 59.1-504.2;

uu.    Wash. Rev. Code Ann. § 6A.2-313;

vv.    W. Va. Code § 46-2-313;

ww.   Wis. Stat. § 402.313; and

xx.    Wyo. Stat. § 34.1-2-313.

166.    As a direct and proximate result of Defendants' breach of the express warranties,

Plaintiffs and Class Members were damaged in the amount of the price they paid for the Products,

in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
## FRAUDULENT CONCEALMENT
### (On Behalf of Plaintiffs and All Class Members)

167.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

168.    Defendants concealed and failed to disclose on the Products' packaging and labeling the material fact that the Products contained benzene, and that the Products were not safe or healthy for use.

169.    Defendants had knowledge that the Products contained benzene, and that the Products were not safe or healthy for use.

170.    Defendants have a duty to disclose that the Products contained benzene, and that the Products were not safe or healthy for use.

171.    Defendants had superior knowledge or means of knowledge available to them and knew that Plaintiffs and Class Members would rely upon the representations and omissions of Defendants regarding the quality and ingredients of their Products.   Consumers lack the meaningful ability to test or independently ascertain or verify whether a product contains benzene, especially at the point of sale.

172.    Defendants' concealment was material and intentional because people are concerned with what is in the products that they are putting onto and into their bodies.  Consumers such as Plaintiffs and the Class Members are influenced by the ingredients listed, as well as any warnings (or lack thereof) on the products they buy.  Defendants know that if they had not omitted that the Products contained benzene, then Plaintiffs and the Class would not have purchased the Products at all; however, Defendants wanted to increase sales and profits.

173.    Defendants' concealment misled Plaintiffs and the Class as to the true nature of what they were buying and putting onto and into their bodies.

174.    Defendants fraudulently concealed that the Products contained benzene and that the Products were not safe or healthy for use.  Consequently, Plaintiffs and the other members of the Class have suffered injury and are entitled to damages in an amount to be proven at trial.

### FIFTH CAUSE OF ACTION
### MEDICAL MONITORING
**(On Behalf of Plaintiffs and All Class Members)**

175.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

176.    As a result of Defendants' negligence, Plaintiffs and Class Members have been subjected to exposure to the carcinogen benzene.

177.    As a proximate result of Plaintiffs' and Class Members' exposure to benzene, Plaintiffs and Class Members have a significantly increased risk of serious medical complications, including ailments such as bone marrow harm and blood cancer (such as leukemia).

178.    A monitoring procedure exists that makes the early detection of these types of ailments possible.

179.    The prescribed monitoring program is reasonably necessary according to contemporary scientific principles.

180.    Defendants' acts were willful, wanton, or reckless and conducted with a reckless indifference to the health and rights of Plaintiffs and Class Members.

## SIXTH CAUSE OF ACTION
## UNJUST ENRICHMENT
### (On Behalf of Plaintiffs and All Class Members in the Alternative)

181.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

182.    Plaintiffs, on behalf of themselves and consumers nationwide, bring a claim for unjust enrichment.

183.    Defendants' conduct violated, *inter alia*, state and federal law by manufacturing, advertising, marketing, and selling the Products while misrepresenting and omitting material facts.

184.    Defendants' unlawful conduct, as described in this Complaint, allowed Defendants to knowingly realize substantial revenues from selling the Products at the expense of, and to the detriment or impoverishment of, Plaintiffs and Class Members and to Defendants' benefit and enrichment.  Defendants have thereby violated fundamental principles of justice, equity, and good conscience.

185.    Plaintiffs and Class Members conferred significant financial benefits and paid substantial compensation to Defendants for the Products, which were not as Defendants represented them to be.

186.    It is inequitable for Defendants to retain the benefits conferred by Plaintiffs and Class Members' overpayments.

187.    Plaintiffs and Class Members seek establishment of a constructive trust from which Plaintiffs and Class Members may seek restitution.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for judgment as follows:

A.    Declaring this action to be a proper class action and certifying Plaintiffs as the

representatives of the Class under Rule 23 of the Federal Rules of Civil Procedure;

     B.    Entering preliminary and permanent injunctive relief against Defendants, directing Defendants to correct their practices and to comply with New York's consumer protection laws;

     C.    An Order requiring Defendants to establish a blood testing program for Plaintiffs and the Class, as well as to establish a medical monitoring protocol for Plaintiffs and the Class to monitor individuals' health and diagnose at an early stage any ailments associated with exposure to benzene;

     D.    Awarding monetary damages and treble damages;

     E.    Awarding statutory damages of $50 per transaction, and treble damages for knowing and willful violations, pursuant to N.Y. GBL §349;

     F.    Awarding statutory damages of $500 per transaction pursuant to N.Y. GBL §350;

     G.    Awarding punitive damages;

     H.    Awarding Plaintiffs and Class Members their costs and expenses incurred in this action, including reasonable allowance of fees for Plaintiffs' attorneys, experts, and reimbursement of Plaintiffs' expenses; and

     I.    Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues.

Dated: March 14, 2022

**LEVIN SEDRAN & BERMAN LLP**

/s/ David C. Magagna Jr.
David C. Magagna Jr., Esq.
Charles E. Schaffer, Esq.
**LEVIN SEDRAN & BERMAN LLP**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: 215-592-1500
dmagagna@lfsblaw.com
cschaffer@lfsblaw.com

Joseph P. Guglielmo
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Tel:  212-223-6444
Fax: 212-223-6334
jguglielmo@scott-scott.com

Jason P. Sultzer, Esq.
Joseph Lipari, Esq.
Daniel Markowitz, Esq.
**THE SULTZER LAW GROUP P.C.**
270 Madison Avenue, Suite 1800
New York, NY 10016
Tel: (845) 483-7100
Fax: (888) 749-7747
sultzerj@thesultzerlawgroup.com
liparij@thesultzerlawgroup.com
markowitzd@thesultzerlawgroup.com

*Counsel for Plaintiffs and the Class*